**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MATTHEW DITNES, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.: |
| MATCH GROUP, LLC, | ) ) | JURY TRIAL DEMANDED |
| Defendant. | ) ) | |

**CLASS ACTION COMPLAINT**

Plaintiff, Matthew Ditnes, individually and on behalf of all others similarly situated, through his undersigned counsel, alleges for his Class Action Complaint against Defendant, Match Group, LLC, based upon personal knowledge as to himself and his own acts and experiences, and, as to all other matters, upon information and belief, including the investigation conducted by his counsel as follows:

**NATURE OF THE ACTION**

1. This action arises from Defendant's practice of selling subscriptions to its Match.com dating site whereupon subscribers begin to receive messages from persons identified as members of the site who are in fact not members.

2. Defendant routinely solicits paid subscriptions to its service without disclosing that subscribers will receive messages from persons identified as members who are not.

3. Only after paying a fee of between 15.99 to 35.99 per month do subscribers learn that they will be bombarded with messages from persons purporting to be members of the site but who are not.

4.    Upon information and belief, Defendant created, or allowed others to create, thousands of profiles of "members" from which messages were sent to legitimate members like Plaintiff and the Class who paid for their subscriptions in order to connect with others like them on the site.

5.    The above-described practices, alleged in further detail below, give rise to Plaintiff's and the putative class' claims for violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* (Count I), violation of the Illinois Dating Referral Services Act, 815 ILCS 615/1 *et seq.* (Count II), breach of implied contract (Count III) and unjust enrichment (Count IV).

## JURISDICTION AND VENUE

6.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2), as this is a class action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which members of the class, which number in excess of 100, are citizens of states different from Defendant.

7.    Jurisdiction over Defendant is proper under 735 ILCS 5/2-209(b)(4) (corporation doing business within this State), and Section 2-209(c) (any other basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States).  735 ILCS 5/2-209(b)(4), and (c).

8.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events giving rise to the claim occurred in this district.  In addition, upon information and belief, tens of thousands of class members reside in this district.  Further, three Match-affiliated companies maintain headquarters in this district.

9.      The members of Match Group, LLC, and their citizenship are unknown and are not a matter of public record. Nonetheless, Plaintiff believes that no member is a citizen of Illinois.

## PARTIES

10.      Plaintiff, Matthew Ditnes ("Plaintiff" or "Mr. Ditnes"), is a natural person domiciled in Bensalem, Pennsylvania.  Plaintiff is a member of the putative class defined herein.

11.      Defendant Match Group, LCC ("Match Group," "Match.com" or "Match") is a limited liability company organized under the laws of Delaware with its principal place of business in Dallas, Texas.  Match claims to be the worldwide leader of online dating services, operating a portfolio of over 45 brands, including Match, Tinder, PlentyOfFish, among others.  Match is the dating services site used by Plaintiff and the class defined herein.

## BACKGROUND

12.      Online dating service providers allow enrolled consumers access to databases of other enrolled consumers for the purpose of finding potential romantic partners, typically based on certain criteria, including such things as age, gender, sexual orientation, race, and location. To facilitate finding a compatible person (or "match"), providers typically allow consumers to interact with one another, often by utilizing Internet-based communications such as electronic mail ("e-mail"), online (video or telephone) chat, and instant messages.

13.      To use an online dating service, providers typically require consumers to first enroll and create a "profile." A consumer's profile will contain information about the consumer, and within these profiles, consumers often are able to upload pictures and provide descriptive and personal information viewable by other users of the service.

14.      In many instances, whether a consumer will find a compatible match is largely dependent on the quality and quantity of profiles available on the service. The more profiles a user

has access to, and the more information contained within those profiles, the more likely that user is to find a compatible match. Some providers may use objective criteria to facilitate finding a compatible match. For example, some providers may filter profiles that do not match a user's expressed preferences, such as the profiles of other users not residing within specified geographic areas, or who are not of an expressed religious or sexual orientation.

15. Providers typically charge consumers for access to and use of their online dating services. In some instances, providers may give consumers free access to their online dating services. In many of these instances, however, providers often will limit the amount of access that non-paying users have to that provider's services. For example, providers may give limited time free trials, or they may restrict the types of services non-paying users can access before payment is required. Restricting a non-paying user's access to a provider's full range of online dating services often will serve to encourage those users to pay for a broader range of services.

## MATCH.COM

16. Revenue from Match Group's dating service segment, which it refers to by its website address "Match.com" or simply as "Match," is primarily derived directly from users in the form of recurring membership fees, which typically provide unlimited access to a bundle of features for a specific period of time, and the balance from à la carte features, where users pay a fee for a specific action or event. Each of its brands, including Match, offers a combination of free and paid features targeted to its unique community. In addition to direct revenue from its' users, Match Group generates indirect revenue from online advertising.

17. Match Group's products, including Match.com ("Match"), enable users to establish a profile and review other people's profiles without charge. However, each product also

offers additional features, some of which are free, and some of which require payment depending on the particular product.

18.     In general, access to Match Group's premium features requires a paid membership, which is typically offered in packages (primarily ranging from one month to six months), depending on the product and circumstance.  Prices differ meaningfully within a given brand by the duration of membership purchased, by the bundle of paid features that a user chooses to access, and by whether or not a customer is taking advantage of any special offers.

19.     Match was launched in 1995 and helped create the online dating category. Among its distinguishing features is the ability to both search profiles, receive algorithmic matches and the ability to attend live events, promoted by Match, with other members. Because the ability to communicate between members is generally a component of paid membership, Match has a high percentage of paying users which generally indicates a higher level of intent than some of their other brands.

20.     In addition to paid memberships, many of Match Group's products offer the user the ability to promote themselves for a given period of time, or to review certain profiles without any signaling to the other members, and these features are offered on a pay-per-use basis.  The precise mix of paid and premium features is established over time on a brand-by-brand basis.

21.     Roughly 30 million unique users, or about 10% of the U.S. population, visit dating sites every month. And many of them pay a hefty sum for that chance to meet their perfect match. With over 21 million users, Match.com is the biggest subscription-based site in the U.S.

22.     Match's online dating service website typically features several different pay-based membership plans ("subscriptions") that range from approximately $16 to $36 per month depending on the level of service chosen. The duration of Match's subscriptions range from one

month to twelve months, and consumers typically can select from three or four different subscription durations. For example, on Match's website, consumers can select a: (a) 3 month plan for $24.99 per month; (b) 6 month plan for $19.99 per month; or (c) 12 month plan for $17.99 per month.

23.     Once the consumers have selected a subscription, the subscriptions will be renewed automatically at the end of the chosen term, and the consumers will incur further charges, unless the consumers take affirmative steps to cancel their subscription.

24.     Match's website also typically features a "free" membership plan that allows consumers to set up a profile at no cost.

## PROLIFERATION OF FAKE PROFILES ON MATCH

25.     Consumers who select Match's free membership plan are allowed to set up a profile containing photographs and personal information. In numerous instances, once enrolled, non-paying members can view the profiles of other users, but their ability to communicate with other users is restricted. For example, only paying members can email other users—which is essential to making a connection. Non-paying members who attempt to execute these actions are redirected to Match's upgrade webpage where they are encouraged to enroll in a paid subscription to Match's online dating service.

26.     When enrolling in Match's service, consumers are required to provide an e-mail address. Match uses this e-mail address to communicate with consumers regarding enrollment in Match's online dating service and to provide enrolled consumers with notifications about activity directed to the consumer's profile. For example, consumers may receive an e-mail from Match when another user is "interested" in them.

27.     Once consumers have enrolled in Match's online dating service, their profiles are viewable and accessible by other users of the service. Almost immediately after completing the enrollment process, users begin to receive e-mails from Match notifying them that they have received communications from other users. For example, within minutes of enrolling, users typically receive an e-mail notification indicating that the user has "New Daily Matches" or that another user has sent a "wink" indicating their interest.

28.     In the next few days, users typically are notified that they have received several additional communications that purport to be from other users, such as additional "New Daily Matches," additional "winks," written messages, or notices that another user is "interested" in them. Frequently, non-paying members are unable to either read or reply to many of these communications without first becoming a paid member.

29.     In many instances, the communications consumers receive are not from actual users of Match's online dating service. Many users routinely discover that the profiles of the persons who purportedly are interested in them are fake or fraudulent profiles and not associated with anybody whom they can date or even communicate.

30.     Upon information and belief, while Match purports to have "millions" of active subscribers, upon information and belief, well over half of the profiles on its site are fake and fraudulent profiles.  These types of profiles are unreachable by legitimate users attempting to avail themselves of the services offered by Match and paid for via subscription fees.

31.     With regard to what appear to be thousands of fake and fraudulent profiles, Match makes little to no effort to vet, police, or remove these profiles and thereby permits, condones, and acquiesces in their posting.

32.     Match appears to have little or no incentive to remove the fake users or remedy the situation.   Upon information and belief, the fake accounts generate revenue for Match by artificially increasing the number of "members" who use its service, which is a key element of its marketing campaigns.

33.     The effect of these deceptive practices was to mislead Plaintiffs and other members of the Class into believing that all users were in fact actual persons, and therefore potential mates, when Match knew that many of its so-called users were fake profiles created for the purpose of spamming legitimate, paying members like Plaintiff.

34.     As a result, numerous non-paying members have been induced to upgrade to paid subscriptions, or induced to continue to pay for their existing paid memberships, so that they can read and respond to the communications they are receiving, only to find out that the communications belong to fake or fraudulent profiles.

35.     Defendants have been the subject of a litany of complaints, from a large number of dissatisfied customers, who have complained to Defendants about its' unlawful and deceptive business practices set forth herein.

36.     The Consumers Affairs website, which provides a forum for consumers to post reviews of their experiences with a brand, includes hundreds of complaints from current customers of various Match.com services regarding the alleged practices set forth herein.  *See Match.com Consumer Reviews and Complaints,* Consumer Affairs, https://www.consumeraffairs.com/dating_services/match.html (last visited Feb. 13, 2018). A sample of the complaints are provided below (errors in original):

**Aaron of Chaska, MN**

First off if you're a guy on Match, 90% of the profiles are fake. They last about a day and they're people wanting you to join sex

websites. 2nd most of their profiles are inactive but they show them as active to draw in people. 3rd I discontinued my membership in July. On December 28th, they found my new credit card number less than 30 days old account and charged that. I never gave it to them they somehow found it on their own. Beware of their fraud.

**Sam of Atlanta, GA**

I do not usually write reviews. This one is necessary. Match is a scam on several levels. There are an enormous number of fake profiles on the site that randomly "Like" and "Favourite" you before you pay. This gives you the incentive to pay and check out who liked your profile. When you do pay, the people who like you are all crap and fake. I verified this two different times with two different accounts over two years. They will claim that they cannot control these fake accounts and while that may be true to some extent, they are nowhere near the problem on any other dating app or site (Coffee Meets Bagel/Bumble/POF) for example.

**Michelle of Stow, OH**

DO NOT... I REPEAT... DO NOT sign up for this site. Not only for the reasons everyone else has mentioned... fake accounts, bogus "matches"... etc, but they are shady!!! My account was hacked, got an email that my password had changed... which I did not change. So obviously, now someone has access to my credit card. Now I've had to cancel that card and get a replacement. I was one month into my 6 month membership when this happened... which by the way got signed up by literally a slip of the finger. Btw... did I mention the website does NOT verify you would like to make a purchase before taking your money? So I call to cancel the remainder of my membership, because, well, they obviously are not a secure site right? I've had to cancel my credit card which causes a whole myriad of issues as some of you know.

**Mark of Plantation, FL**

Match.com does not allow you to get any sort of refund if you wish to cancel. They will up-sell you into longer subscriptions; don't buy it! They hide behind weird policies and terms to keep profiles viewable unless they are "specifically" turned off. You are probably messaging 50% ghost accounts in my opinion. Fake profile with same usernames in multiple cities appear.

"Profile unavailable" will always appear. Expect many unread messages because of all of this. Adding to all of this is the people who lie about their age and the scammers who are on the prowl and you should just avoid this site at all costs.

**Jim of Ft. Lauderdale, FL:**

After 2 1/2 years with Match I'm done. They are a fake dating site. The poor souls who trust the info Match provides (I was one of them) are many times based on lies. In order to get you to re-sign for another 6 months or 1 year, Match.com will send you fake emails from attractive women. DON'T WASTE YOUR TIME or MONEY. Better off joining a yoga class!

**Scott of Hallandale Beach, FL:**

I joined Match about an month ago with high aspirations because the website looks so slick and is well known! Before I even paid for an membership my inbox was covered by supposedly pretty women that had interest in my profile. This was before I had even posted an photo. What an complete joke! I've investigated this site and there are very few real profiles but mainly fake profiles and photos that the staff there e-mail to current and future prospects and customers just to provide them false hopes and to keep the money rolling in!

## FACTS RELATING TO PLAINTIFF

37.     On or about December 30, 2017, Plaintiff created an online profile on Match.com.

38.     Plaintiff paid $59.94 for a six month subscription, with the option of renewing on July 1, 2018 for $79.92.

39.     Immediately thereafter, Plaintiff began to receive emails and/or messages from Match.com stating that numerous other Match.com users were interested in him.

40.     The above-described messages contained many matches using the same picture for the profile, with only the name changed. The messages also contained identical profile characteristics. Examples of such messages are depicted below:



41. Upon receiving the above and similar messages Plaintiff received from Match.com, Plaintiff attempted to view the profiles of the interested users and discovered that most if not all of these people were not in fact members of the site, making interaction or dating impossible.

42. The experience of Plaintiff is not unique, as demonstrated by the anecdotes told by other members of the Class. *See, e.g., Match.com Consumer Reviews and Complaints,* Consumer Affairs, https://www.consumeraffairs.com/dating_services/match.html (last visited Feb. 13, 2018).

43. Upon information and belief, Defendant participated in or allowed the creation of fake user accounts from which messages to legitimate users like Plaintiff and Class were subjected. Notwithstanding its knowledge of the these practices, it has continued to collect subscription fees from unwitting consumers, thereby cheating them out of the amounts they paid for the dating service, and causing them the other forms of damage alleged herein.

## CLASS ACTION ALLEGATIONS

44. This action satisfies the prerequisites for maintenance as a class action provided in Fed. R. Civ. P. 23(a), as set forth below.

45. *Class Definition.* Plaintiff brings this action individually and on behalf of the following class of similarly situated persons (the "Class"), of which Plaintiff is a member:

> All natural persons domiciled in the United States or its territories who, within the applicable statutes of limitation, paid for a subscription to the Match.com dating site and who received messages from persons identified as Match.com members but who were not in fact persons who are members of the site.

Excluded from the Class are Defendant and any of its respective officers, directors or employees, the presiding judge, Class counsel and members of their immediate families, and persons or entities who timely and properly exclude themselves from the Class.

- 12 -

46. *Numerosity.* The members of the Class are so numerous and geographically dispersed throughout the United States such that joinder of all members is impracticable. Plaintiff believes that there are thousands of persons in the Class. The exact number and identity of Class members is unknown to Plaintiff at this time and can only be ascertained from information and records in the possession, custody or control of Defendant.

47. *Commonality.* There are questions of law or fact common to the Class including, *inter alia*, the following:

a. whether Plaintiff and other members the Class received messages from persons identified as Match.com members but who were in fact not members.

b. whether the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.*, applies to the claims of Plaintiff and members of the Class and/or entitles them to relief;

c. whether a contract existed between Defendant on the one hand and Plaintiff and the Class on the other and the terms of that contract;

d. whether Plaintiff and the Class conferred a benefit on Defendant when they paid for their subscriptions and whether it would be unjust for it to retain such benefits under the circumstances alleged herein;

e. whether the Court has subject matter jurisdiction and whether venue in this district is proper;

f. whether Plaintiff and the members of the Class are entitled to their damages, including treble damages, and the appropriate measure thereof; and

g. whether equitable or injunctive relief is appropriate.

48.    *Typicality.*   The claims of Plaintiff are typical of the claims of the Class alleged herein.   Plaintiff and other members of the Class are all persons who paid for a subscription to the Match.com dating site and who received messages from persons identified as Match.com members but who were in fact not members.

49.    *Adequacy.*   Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has retained counsel who are competent and experienced in the prosecution of complex and class action litigation.   The interests of Plaintiff are aligned with, and not antagonistic to, those of the Class.

50.    *Fed. R. Civ. P. 23(b)(2) Requirements.*   The prerequisites to maintaining a class action for injunctive and equitable relief pursuant to Fed. R. Civ. P. 23(b)(2) exist, as Defendant has acted or has refused to act on grounds generally applicable to the Class thereby making appropriate final injunctive and equitable relief with respect to the Class as a whole.

51.    Defendant's actions are generally applicable to the Class as a whole, and Plaintiff seeks, *inter alia*, equitable remedies with respect to the Class as a whole.

52.    Defendant's uniform common course of conduct alleged herein makes declaratory relief with respect to the Class as a whole appropriate.

53.    *Fed. R. Civ. P. 23(b)(3) Requirements.*   This case satisfies the prerequisites of Fed. R. Civ. P. 23(b)(3).   The common questions of law and fact enumerated above predominate over questions affecting only individual members of the Class, and a class action is the superior method for fair and efficient adjudication of the controversy.

54.    The likelihood that individual members of the Class will prosecute separate actions is remote due to the extensive time and considerable expense necessary to conduct such litigation,

especially in view of the relatively modest amount of monetary, injunctive and equitable relief at issue for individual Class members.

55.     This action will be prosecuted in a fashion to ensure the Court's able management of this case as a class action on behalf of the Class.

## COUNT I

**(Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.*)**

56.     Plaintiff repeats and realleges the allegations of Paragraphs 1 through 55, *supra*, as though fully stated herein.

57.     This Count is brought on behalf of Plaintiff and other Illinois Class members and on behalf of those Class members from other states that have enacted a uniform deceptive trade practices act in the same or substantially similar form as that described herein.

58.     At all times material hereto, there was in full force and effect an act commonly known as the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq*. ("ICFA").

59.     Section 2 of ICFA prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use of employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act' [815 ILCS 510/2], approved August 5, 1965, in the conduct of any trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

60.    At all times material hereto, there was in full force and effect in this State an act commonly known as the Uniform Deceptive Trade Practices Act ("UDAP"), 815 ILCS 510/2 *et seq.*, incorporated by reference in Section 2 of ICFA, *supra*.

61.    Section 2 of UDAP provides in relevant part, "A person engages in a deceptive trade practice when, in the course of his or her business . . . the person . . . [1] represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have . . . [2] advertises goods or services with intent not to sell them as advertised; [3] advertises goods or services with intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quantity; or [4]  engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding."  815 ILCS 510/2(a)(5), (9), (10) and (12).

62.    The aforesaid acts and practices of Defendant constitute unfair or deceptive acts or practices prohibited by Section 2 of ICFA, including but not limited to the use or employment of deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of material fact, with intent that Plaintiff and the Class rely thereon.  *See* 815 ILCS 505/2.

63.    The aforesaid acts and practices of Defendant further fall within the practices prohibited by Section 2 of the Uniform Deceptive Practices Act incorporated by reference in 815 ILCS 505/2, *supra*.

64.    Specifically, *inter alia*, Defendant marketed, advertised and/or sold memberships to Plaintiff and the Class under the representation that actual Match.com users "liked" them or were interested in them.  Defendant intended that Plaintiff and the Class rely on these characteristics as evidenced by, *inter alia*, the frequency and content of the emails and messages.

- 16 -

65.     Moreover, in the alternative, Defendant concealed, suppressed or omitted the material fact that Plaintiff and the Class would receive messages from persons identified as Match.com members but who were in fact not members.

66.     As a direct and proximate result of the foregoing, Plaintiff and the Class purchased memberships from Defendant that they would not have purchased had the true characteristics been known to them.  Alternatively, Plaintiff and the Class lacked the information necessary to make an informed choice regarding their decision to purchase such memberships, causing them to pay a monthly service fee for a Match.com membership that is otherwise free.

67.     As a result of the foregoing, Plaintiff and the Class have been damaged in an amount to be proven at trial.

## COUNT II

**(Violation of the Illinois Dating Referral Services Act, 815 ILCS 615/1 *et seq.*)**

68.     Plaintiff repeats and realleges each allegation of paragraphs 1 through 55, *supra*, as if fully set forth herein.

69.     As alleged herein, Defendant qualifies as a dating services enterprise, within the meaning of Section 5 of the Illinois Dating Referral Services Act (the "DRSA"), in that it provides services intended to match adult persons for social and/or romantic encounters and none of the exceptions of the DRSA applies.   815 ILCS 615/5.

70.     Section 40 of the DRSA makes it punishable by damages for any dating services enterprise to commit the following prohibited acts:

> (a)     Unfair or deceptive acts and practices are prohibited, including but not limited to: use of coercive sales tactics; misrepresentation regarding of the quality, benefits or nature of services; misrepresenting the qualifications or number of other members participating in the service; or misrepresenting the

success, or lack thereof, the enterprise has had in making matches or referrals favorable to its customers.

(b)     Any contract for dating referral services entered into in reliance upon any false, fraudulent, or misleading information, representation, notice, or advertisement of the dating referral enterprise or any of its employees or agents shall be void and unenforceable.

815 ILCS 615/40.

71.     During the Class Period, Defendant has used, and continues to use, unfair and deceptive acts and practices in marketing its services, which are intended to coerce Plaintiff and other members of the Class into subscribing to Defendant's services and otherwise misrepresent and/or omit material facts regarding its services, as set forth above.   Among other things, Defendant has misrepresented or failed to disclose the true number of past, present and existing users of its services.

72.     But for the deceptive acts described above, Plaintiff and other members of the Class would not have purchased the services of Defendant.

73.     As a result of Defendant's deceptive acts and practices, Plaintiff and other members of the Class have suffered, and continue to suffer, monetary damages and other recoverable losses.

74.     Pursuant to 815 ILCS 615/45, Plaintiff seeks treble damages on behalf of himself and the other members of the Class.

75.     The contract entered into between Plaintiff and Defendant was procured in violation of Section 40 of the DRSA and otherwise does not comply with the DRSA.  Accordingly, pursuant to 815 ILCS 615/35(c), that contract is void and unenforceable.

76.     Further, because the contract entered into between Plaintiff and Defendant violates the DSRA, that contract and the provisions thereof were unconscionable when made, and the Court should refuse to enforce the contract pursuant to 815 ILCS 615/35(d).

**COUNT III**

**(Breach of Implied Contract)**

77.     Plaintiff repeats and realleges the allegations of Paragraphs 1 through 55, *supra*, as though fully stated herein.  Pursuant to Fed. R. Civ. P. 8(d), this Count is pled in the alternative to Count IV, *infra*.

78.     When Plaintiff and the Class used Match.com's premium services, they entered into a contract with Defendant, wherein Plaintiff and members of the Class agreed to pay a subscription fee.

79.     In exchange, Defendant agreed that Plaintiff and the Class would have access to viable dating options.

80.     Plaintiff and the Class performed their duties under the aforesaid contract by paying the required fee in full.

81.     By sending, or allowing others to send, messages to Plaintiff and the Class from persons identified as Match.com members but who were in fact not members, Defendant breached this contract.

82.     As a result of the foregoing, Plaintiff and the Class have been damaged in an amount to be proven at trial.

**COUNT IV**

**(Unjust Enrichment)**

83.     Plaintiff repeats and realleges the allegations of Paragraphs 1 through 55, *supra*, as though fully stated herein.  Pursuant to Fed. R. Civ. P. 8(d), this Count is pled in the alternative to Count III, *supra*.

84. Plaintiff and the Class conferred a benefit on Defendant by paying subscription fees for access to its Match.com site that it either knew or omitted to disclose would result in their receipt of messages from persons identified as Match.com members but who were in fact not members.

85. Defendant appreciated the benefits of such payments in the form of revenue received from Plaintiff and the Class in the amount of their monthly Match.com fees paid.

86. On information and belief, Defendant profited millions—if not hundreds of millions—of dollars from taking monthly subscription fees.

87. Defendant's acceptance and retention of the aforesaid benefits under the circumstances alleged herein would be inequitable absent the repayment of such amounts to Plaintiff and the Class.

88. As a result of the foregoing, Plaintiff and the Class have been damaged in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of members of the Class, prays for judgment in their favor and against Defendant and for the following relief:

A. Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23, certifying the Class defined herein and designating Plaintiff as representative of the Class and his undersigned counsel as Class counsel;

B. Awarding Plaintiff and the Class (1) their actual damages, (2) such treble damages as the Court may allow, and (3) the costs of this action together with reasonable attorneys' fees as determined by the Court;

C.      Awarding Plaintiff and the Class all allowable pre- and post-judgment interest on the foregoing awarded damages;

D.      Awarding Plaintiff and the Class equitable relief including, *inter alia*, a finding that the contracts they entered into are void and unenforceable and disgorgement of Defendant's ill-gotten gains;

E.       Granting appropriate injunctive and declaratory relief; and

F.      Awarding such other and further available relief and any other relief the Court deems just and appropriate.

### JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Date:  May 2, 2018                                    Respectfully submitted,

                                                                       MATTHEW DITNES

                                              By:      s/ William M. Sweetnam
                                                                       _____

                                                                       William M. Sweetnam
                                                                       Natasha Singh
                                                                       SWEETNAM LLC
                                                                       100 North La Salle Street, Suite 2200
                                                                       Chicago, Illinois  60602
                                                                       (312) 757-1888
                                                                       wms@sweetnamllc.com
                                                                       ns@sweetnamllc.com

                                                                       *Attorneys for Plaintiff and the Class*